**Randolph T. WALKER, Plaintiff,**

v.

**RESOURCE DEVELOPMENT COMPANY LIMITED, L.L.C. (DE), and William J. Cox, Jr., William C. Baron, William C. Liedtke, III, and Redeco Limited, L.L.C. (TX), Defendants.**

**C.A. No. 1843–S.**

Court of Chancery of Delaware, Sussex County.

Submitted: July 24, 2000.
Decided: Aug. 29, 2000.

17.  *Security First Corp.,* Del.Supr., 687 A.2d at 567 (1997).

Richard S. Phillips, Walsh & Phillips, Georgetown, for Plaintiff.

Frederick L. Cottrell, III, Jeffrey L. Moyer, Richards, Layton & Finger, Wilmington; Benjamin G. Chew, Patton Boggs, L.L.P., Washington, D.C., for Defendants.

## OPINION

LAMB, Vice Chancellor.

### I. INTRODUCTION

This is a post-trial opinion concerning the power of the members of a majority in interest of a Delaware limited liability company to remove the entity's other member and declare his interest forfeited. According to the managing member, on the same day he determined that the entity would not receive much needed financing from a source introduced by the fourth member, that other member disclosed to him an inappropriate compensation arrangement with the potential financier. With the consent of the other two members, the managing member determined to remove the fourth member from the LLC without compensating him for the fair value of his economic interest therein. But the other member refused to sign the removal agreement.

Trial was held on March 15–16, 2000. The post-trial briefing provided limited assistance to the court.[1] Oral argument was held on July 26, 2000 and the defendants submitted a supplemental post-trial brief.

Two fundamental issues are presented. First, did the operating agreement of the LLC or the default provisions of the law give the defendant members the right or power to remove the fourth from the entity and forfeit his membership interest? Second, if not, have they shown that their assent to the terms of that operation agreement was the product of fraud or misrepresentation?

I reach two pertinent conclusions. First, there is no support, in the operating agreement of the LLC or the law governing such entities, for the expropriation of a member's equity interest. Second, there

---

1. Plaintiff's two and one-half page post-trial brief, in particular, was virtually useless to the court in reaching a decision. Defendants' post-trial brief contains a more detailed, if one-sided, statement of facts, but little or no legal argument.

is no viable claim for misrepresentation or fraud because, even if some misrepresentation was made by omission, plaintiffs clearly did not rely on it when they signed the operating agreement.

## II. BACKGROUND

### A. The Parties

Plaintiff Randolph T. Walker is a cousin of former President Bush. Walker testified to having attended Windham College[2] and to having participated in several courses offered by the Commercial Investment Real Estate Association. Walker also testified that his presence at various banking conferences as a non-attendee gave him experience in sophisticated financial consulting.[3]

Defendant William J. Cox, Jr., before the events described herein, was an intelligence officer in the United States Navy. Defendant William C. Baron met Cox while serving as an intelligence officer for the Department of Defense. Prior to leaving the service, they spent time serving in the former Soviet Republic of Moldova. Both had certain technical expertise that would help them in working in the oil and gas industry, but had no significant business experience. Defendant William C. Liedtke, III, is an oil and gas attorney and is the son of William C. Liedtke, Jr. The elder Liedtke, along with his brother J.

Hugh Liedtke, were partners and close associates of former President Bush in various oil and gas related business ventures. Liedtke has considerable legal and business sophistication, especially in the oil and gas industry.

Defendant Resource Development Company, Limited, L.L.C. ("REDECO") is a Delaware limited liability company founded by Cox and Baron.[4] Between April 4 and August 23, 1995, at the very least, REDECO's members were defendants Cox, Baron and Liedtke (collectively, the "three Bills") and plaintiff Walker. Defendant REDECO Limited, LLC is a Texas entity that was created after the events relevant to this matter took place.[5]

### B. Walker Meets Cox and Baron and Joins REDECO

On December 16, 1994, Bill Cox negotiated and secured a Letter of Intent signed by the Prime Minister of Moldova, pursuant to which REDECO would obtain an oil and gas exploration and production concession from the Moldovan Government. It contemplated that the parties would enter into a formal concession when final documents were negotiated and final approvals obtained. The Letter of Intent provided that REDECO, an entity Cox and Baron established, would have a five-year drilling commitment in Moldova beginning in 1995.

---

2. Walker claims that this school shut down after his graduation and although he earned a degree, he never obtained a diploma.

3. On cross-examination, defendants' counsel asked Walker to elaborate on his experience. Walker explained, "I think I had reached the point in my life whereby working with the European Institute and the Aspen Institute on banking conferences ... I had the contacts with international banks to assist in [financing transactions]." Tr. at 134. Explaining the capacity in which he attended, Walker stated, "I was invited by the assistant to the president because I wanted to attend—we live near the Aspen Institute and they were very

expensive meetings, and so they acknowledged that I could attend without paying ... if I photographed." Id. at 135–36. Also, Walker attended the European Institute "[a]s a guest with a camera, and they paid [him] for it." Id. at 137.

4. Cox and Baron always called REDECO an LLC, although its Certificate of Formation was not formally filed with the Delaware Secretary of State until April 18, 1995.

5. Though not impacting any of my conclusions, I will dismiss REDECO Texas, which has properly been dissolved, from this action.

REDECO needed to raise approximately $5 million per year to fund its operations under the commitment.

At the end of 1994, Walker was involved in difficult divorce proceedings and was experiencing various personal problems, including a bout of alcohol abuse. In early February 1995, he planned a vacation to Hawaii to "get a break" but a snowstorm in Washington, D.C. delayed his departure. Walker booked a room at the Four Seasons Hotel and visited the bar. Walker overheard Baron telling the bartender about his venture in Moldova. Walker chimed in, noting that he is the first cousin of the former President. Walker stated that he had access to valuable business connections and was known for a strong personal reputation.

At trial, Baron explained his initial contact with Walker:

> And Mr. Walker claimed that he had not only the prior knowledge and ability to provide financing but he had done these sort of things in the past. For the amount of money we were looking for, it was not a big deal. He could do it right away. He knew all sorts of people, all over the world.
>
> I mean, he literally walked the walk and talked the talk, like financiers do. And he presented a great image. And he was very believable, to the point where I said, well, I would like you to meet the managing partner of our company. It seemed to me like a wonderful opportunity that presented itself.[6]

Baron scheduled a meeting between Walker and Cox. When they met, Cox was equally taken in by Walker's apparent sophistication. Walker commented on the need to improve REDECO's business plan presentation, which he thought was "very unprofessional." Walker also contacted representatives of several potentially interested parties known to him through family connections, although none of these parties expressed immediate interest in REDECO.

Walker next introduced Cox and Baron to Stephen L. Norris, the founder of an investment fund called The Appian Group. Walker told Cox that the Appian Group "was a merchant bank with considerable financial resources, large investors from the Middle East, and just huge amounts of money behind it."[7] Norris was a high-level appointee during the Bush Administration. Norris expressed some interest.

Because they needed money to develop the Moldovan concession, and believing that a partnership with Walker could be useful, Cox and Baron suggested that Walker and REDECO establish a close relationship. On February 6, 1995, REDECO signed an agency agreement with "The Walker Company,"[8] through which Walker would "act as agent for REDECO for the limited purpose of negotiating with potential investors in REDECO's business projects in Moldova." Two days later, the parties executed an "Agreement For a Business Partnership Between REDECO LTD., LLC and The Walker Company."[9]

---

6. Tr. at 310–11 (Baron Direct).

7. Tr. at 253 (Cox Direct); Tr. at 317 (Baron Direct).

8. In fact, the Walker Company is nothing more than Randy Walker individually.

9. In this agreement, Walker's obligations are described as follows:
   WALKER'S RESPONSIBILITIES: Walker is a financial consulting firm with expertise in structuring financial agreements, identifying and securing private and industry capital, negotiating and securing loans, and advising on financial relationships with domestic and international banks and government financial entities. As provided in this agreement, Walker will identify and secure financing for both new and ongoing projects, subject to such terms and in such amounts as may be mutually agreed to by the Team on a project-by-project basis.

Part of the Agreement describes Walker relationship with REDECO as that of a finder, working for a set fee, and another part describes Walker as a member of the partnership.[10]

Except for the survival of the arbitration clause, this agreement provided that it would terminate automatically if Walker failed to close a financing transaction by March 30, 1995. Further, REDECO retained a right to terminate the agreement at any time following the occurrence of, *inter alia:*

> breach by Walker of any material term of this Agreement, and of any agreement executed and delivered pursuant to the terms of this Agreement, if not cured by Walker within thirty (30) days after receipt by Walker of written notice of such breach from REDECO, which notice shall set forth in reasonable detail the facts forming the basis of the breach.

## C. Liedtke Joins the Business and Walker Travels With Norris

Walker introduced Cox and Baron to Bill Liedtke, an experienced oil and gas attorney and consultant. Leidtke first met Cox and Baron at the end of February when they presented the Moldovan opportunity to POGO Petroleum, a company with which Liedtke's family is involved. Although POGO declined to invest, from that point on, Liedtke personally spent a good deal of time working with Cox, Baron and Walker.

Before Walker could leave for Hawaii, Norris invited him to Europe and Walker accepted. While travelling in Europe, Walker and Norris shared expenses, but it appears that Norris paid the vast majority of those costs, to the extent that May, Walker owed Norris about $13,000.[11]

During these travels, Walker discussed REDECO with Norris. Walker wanted Norris to finance the concession project, which the parties termed the "upstream" aspect of the business. Norris expressed interest but wanted to structure a companion deal in which AGIP Petroli, Italy's national oil company, would invest money in a series of gas stations inside Moldova, referred to as the "downstream" aspect of the business. In connection with this AGIP deal, Norris sent a brochure to Liedtke, apparently seeking an investment by him or his uncle. Since Liedtke "was a little perplexed" by this unsolicited contact (and troubled by Walker's involvement in it), Liedtke never gave the brochure further consideration.[12] In any event, Norris eventually made clear that any financing he might provide for the upstream operations would be contingent on his and REDECO's involvement in the downstream operations.

As of March 30, 1995, Walker had not obtained the promised $5 million for RE-

---

10. In return for Walker's assistance, REDECO bound itself, upon the initial $5 million investment provided through or by Walker, to assign to Walker "a twenty percent (20%) revenue interest defined as: the net revenues flowing to REDECO after payments to the Moldovan Government, and to the investors." To the extent that Walker's involvement with the business would solely be through fundraising, it made sense for Cox and Baron to create this structure, retaining Walker solely as a consultant paid a finder's fee for achieving that goal. The Agreement also provides, somewhat inconsistently, that Walker will be paid a salary by REDECO and will receive a partnership draw.

11. It is unclear whether both shared the travel expenses and an imbalance developed or Norris paid for substantially everything. According to Walker, incredibly, he spent about $250,000 during this general time period. Tr. At 210 (Walker Redirect).

12. Liedtke Dep. at 81.

DECO. Thus, the February 8, 1995 Agreement expired by its own terms.

While Walker was with Norris in Europe, the three Bills were busy putting together the business plan and trying to get final documentation for the Moldovan concession. At first, Liedtke worked for REDECO solely as a consultant. According to Liedtke, "I treated it as a consulting arrangement even after being given an interest in the LLC later. It was just a side venture in my office."[13] By April, however, Liedtke formally joined REDE-CO to assist with preparing the documentation for REDECO's transactions. According to Liedtke, "I did not request the interest. That was something that was just, that was brought up by Mr. Cox."[14]

Cox distributed an April 4 letter to Walker, Liedtke and Baron, detailing the progress of the venture and explaining the new ownership structure of REDECO. The letter stated that the partnership had grown to four members, with the following proportionate ownership breakdown: 51% for Cox, 21% for Baron, 18% for Walker and 10% for Liedtke. Cox wrote that "[t]he partnership *is now closed.*" An April 24 memorandum from Cox to Liedtke, Baron and Walker explained that there are two categories of partners, full-time and part-time. Cox wrote that "[f]ull time partners ... work only for REDE-CO. Besides their ownership, they will receive a salary." In contrast, "[p]art time partners may pursue other interests. Besides their ownership, they will receive an annual stipend of $48,000.00, or $4,000.00 per month." Presumably, Baron and Cox

were full-time partners while Walker and Liedtke were part-time.

## D. Walker is Removed From His Position as Fundraiser

The evidence at trial showed that each of the three Bills duly performed his job responsibilities for REDECO, under the direction of Cox, acting as Managing Member of the LLC. Further, on May 10, 1995, Cox requested a capital contribution by each of the members. Baron paid in his contribution by paying expenses incurred by him on the company's behalf and not seeking reimbursement.[15] Liedtke originally paid in his contribution by forwarding expenses,[16] but testified that he wrote "one check," on "approximately August 21st for about $1,800."[17] At some point in July, Walker paid in $700. The record does not detail how, precisely, Cox made his contributions.

Walker failed to secure any financing. Indeed, aside from those initial telephone calls and his efforts with Norris, there is no evidence that Walker actually sought financing on REDECO's behalf. Rather, he was travelling partly for business but mostly for pleasure, sometimes with Norris and sometimes on his own, keeping in touch with the three Bills primarily to discuss the progress of negotiations with the Appian Group.

In the meanwhile, Cox and Baron were still negotiating the terms of the Moldovan concession. In order to show REDE-CO's ability to finance the business, Norris sent Cox and Baron a letter dated April 5, 1995, describing the possibility of

13. Liedtke Dep. of Jul. 6, 1998, at 47.

14. *Id.* at 48.

15. Although Baron testified to having eventually invested some amount of his own cash into the business, he, like Walker, paid for business expenses such as plane tickets, hotel bills and so on from his own funds and considered that part of his investment in REDE-CO. Baron Dep. of Aug. 31, 1999, at 33–36.

16. Liedtke Dep. at 71–75.

17. Tr. at 343.

his participation in both the upstream and downstream ventures. Cox and Baron explained Walker's involvement in the venture to the Moldovan representatives.[18] Impressed, the Moldovans working on the deal asked to meet the cousin of the former President of the United States.

Cox contacted Walker, who was in Vienna, and asked him to join them in Moldova. Walker initially agreed to make the trip, but on three separate occasions, failed to travel from Vienna to Moldova where his arrival was eagerly awaited by an "official government motorcade . . . [of] senior officials of the Moldovan government."[19]

Walker testified unpersuasively that he refused to go to Moldova because Cox insisted that he enter the country illegally, without a visa, and bring a large amount of cash with him. Cox denies this, and I find Walker's testimony on this point to be incredible. According to Cox, Walker was inebriated when they spoke by telephone[20] and explained his failure to appear in Moldova on the fact that his credit cards had been seized.[21] Walker adamantly insisted that Cox use his own credit card to get Walker out of Vienna. After discussing the matter with Baron and Liedtke, however, the three Bills decided to refuse Walker's request because of his financial irresponsibility.[22]

Shortly after this incident, Cox called Norris to inquire into the situation. Cox testified that "[Norris] stated that Mr. Walker would have to be removed as the point of contact with him. He would no longer deal with Mr. Walker."[23] Cox's deposition testimony elaborated on this conversation in greater detail. According to Cox, when he called Norris,

> Steve told me at that point he was very glad that I called up because he was at wit's end with Randy *and that Randy now owed him a lot of money,* and Randy had been causing him problems, and Steve told me, he said if Randy remains in the deal, I am not going to conclude anything with you, and I asked him to repeat that, and I said—I gave him assurance at that point that I would make sure that Randy was removed from any further negotiations with the Appian Group or from the project, as per Steve Norris' request.[24]

Apart from Norris' demand that he not deal with Walker, the three Bills had other concerns about Walker, including his evident drinking problem, financial irresponsibility, indebtedness to Norris, and failure to appear in Moldova.

Accordingly, Cox removed Walker from

---

**18.** Just as Walker uses his contacts to impress others and make himself appear to be experienced in fields in which he is not, Cox and Baron gave themselves an air of credibility by using Walker's name and influential family connections.

**19.** Tr. At 258.

**20.** Bill Baron, who also spoke with Randy Walker while he was in Vienna, confirmed Cox's account: "When I talked to him [Walker] on the phone, he was drunk." Tr. at 319 (Baron Direct).

**21.** *Id.* at 258–259 (Cox Direct).

**22.** Liedtke testified that he learned through Cox that after the three Bills refused Walker's

request on account of his irresponsibility, Walker "had contacted Steve Norris, with whom we were attempting to negotiate a capital infusion, and had sought funds from him to cover these [expenses], which was perceived as a conflict of interest and damaging to the ongoing negotiation with the Appian group." Liedtke Dep. Jul. 6, 1998, at 87–88.

**23.** Tr. At 261.

**24.** Cox. Dep. of Jan. 21, 1999, at 76–77 (emphasis added). Surprisingly, defendants argue in their post-trial briefs that prior to July 25, 1995, the three Bills did *not* know of Walker's indebtedness to Norris.

his official duties with REDECO.[25] Norris was copied on the Managing Member's Notice of Removal dated May 11, 1995.

The letter states that Walker would be removed "from all official duties as a Member of REDECO Ltd." The letter explains that the decision:

> comes about after a series of unfortunately embarrassing actions by Mr. Walker that bring our current oil and gas exploration projects into jeopardy. As stipulated in our operating agreement, personal bankruptcy, inability to meet personal financial commitments to the partnership, and failure to perform assigned duties and tasks are all reasons for removal.... A vote of the remaining Members regarding this action will be taken in our June meeting.

Walker contacted REDECO to determine the letter's meaning. In response, Baron sent him a letter dated May 18, 1995, explaining that "Bill Cox, as the Managing Member, still intends to authorize your 18% of the Management Fee, as originally agreed. In this respect, you are still being 'included.'" In other words, Walker lost his job, but Cox did not purport to eliminate Walker's ownership interest in REDECO.[26]

## E. Norris Insists on Walker's Reinstatement

A few weeks later, Walker contacted Cox and, according to Cox, stated that "he had a problem with alcohol .... He had cleaned up his act. He was on the wagon. And he told me he was back in good graces with Mr. Norris."[27] Walker also told Cox that the "financing with the Appian Group, which was going to happen very soon, would only happen if [Walker] were involved in the transaction." When Cox sought to confirm this representation, Norris "demanded that Randy be back in the deal or he would not close any financing with [REDECO]."[28]

With REDECO's need to secure financing becoming ever more urgent and the Appian Group the only live possibility, the three Bills decided to allow Walker back into his job. Through June and July 1995, however, it was Cox—not Walker—who worked with Norris to close the deal.

In order to get the financing needed to begin the upstream project, REDECO was

25. Liedtke's account of the reasons for Walker's termination notes Cox's discussion with Norris in which "Norris disclosed to Bill that Randy Walker was in debt to him. And there was—I was concerned when I got the memo regarding the investment in IP [the parent of AGIP]. It, to me, presented some sort of an arrangement between Steve and Randy where I was being—I was a potential funding source being introduced to Steve by Randy. That, to me, struck me at the time as being inconsistent with his role in REDECO." Liedtke Dep. at 109. For his part, Baron explained Walker's May 11 removal as being on account of his failure to perform his obligation of providing funding and his failure to appear in Moldova. Baron Dep. at 105–06.

26. At some point during this time period, Liedtke contacted members of the Bush family to inquire abut Walker. He did this on his own and not at the request of Cox or Baron.

He was told that Walker was a generally unpleasant person. Liedtke *did not inquire into Walker's business reputation.* Further, despite the fact, thoroughly obvious at trial, that Walker is not what he originally represented himself to be, neither Cox nor Baron, who knew of Liedtke's close ties with the Bush family, asked Liedtke to inquire as to Walker's business experience or reputation.

27. Walker made similar representations to Stephen Norris to win back his "good graces," stating in a letter to Norris dated June 30, 1995: "I am enjoying my new mindset without the wine, in fact I don't miss it a bit." JE 40. Norris later testified that he too was deceived and that Walker regrettably did not stop drinking during this period. JE 76 (Norris Dep. at 151).

28. Tr. At 263.

willing to agree to Appian's insistence on pursuing the downstream project involving AGIP. In that regard, a meeting was held in Rome, Italy, attended by Cox and Walker, Norris and other Appian representatives, and representatives of AGIP. In light of the ongoing negotiations, Cox testified that "it looked like with the Appian Group we had a closing that was imminent." [29]

### F. The Concession and Operating Agreement are Signed

On July 6, 1995, REDECO and the Prime Minister of Moldova finally executed the concession. Walker played no role in negotiating this agreement.

Also during June and July, Walker and the three Bills negotiated a form of operating agreement for REDECO. REDECO needed to have in place a formal operating agreement prior to finalizing any investment by Appian. The agreement was also needed because to ensure that the three Bills would be protected from liability from Walker's actions. On July 25, 1995, the three Bills and Walker entered into the REDECO LLC Operating Agreement. Despite their knowledge of Walker's personal problems, fiscal irresponsibility, debts to Norris and likely inability to offer financing opportunities other than Norris, the three Bills agreed to give Walker an 18% stake in the entity.

Liedtke testified at his deposition that, when Walker was first reinstated, he was still "on probation." [30] The July 25 Agreement, however, fails to treat Walker differently from the other members. In particular, there is no provision making Walker's continued equity participation contingent either on his performance or closing a deal with the Appian Group.

Several provisions detail the powers and obligations of Cox as Manager. Article X

provides for removal of the Manager by the members "whenever in their judgment the best interest of the Company will be served thereby. *Such removal shall be without prejudice to the contract rights, if any, of any person so removed.*" (Emphasis added.) Thus, removal as a Manager would not impair Cox's ownership rights in REDECO.

Article XII(c), which sets out the same proportionate ownership as was agreed to in April, provides that "(a)ll Company costs and benefits (and the deductions of any tax credits or deductions attributable thereto) shall be allocated to the members in their Sharing Ratios." Article XIX provides that "a member of record has an absolute obligation to perform an enforceable promise to make a contribution, or otherwise pay cash or transfer property owned by the Company."

The honoring of commitments to contribute is enforced solely by Article XX, which provides that "[i]n the event a member fails to make a contribution to the Company required by an enforceable promise, the Company is entitled to reduce the defaulting member's ownership in a proportion that the amount of the default bears to the total contribution of the member." Article XXI provides for a mechanism by which the non-defaulting members can consider and provide written consent to excuse default in making a contribution.

Critically, Article XXII provides for the withdrawal of members. As to involuntary withdrawal, section (b) states that "[a] member of the Company ceases to be a member, and is deemed to have withdrawn from the Company, on the occurrence of any of the following events:

(i) When the member files a voluntary bankruptcy petition.

---

**29.** Tr. At 286.

**30.** Liedtke Dep. at 110.

(ii) If the member is a natural person, the death of the member or an adjudication of a court of competent jurisdiction that the member is incompetent to manage his or her person or property.

(iii) If the member is a corporation, in the filing of a certificate of dissolution for the corporation or the revocation of the corporation's charter.

(iv) If the member is an estate, on the personal representative's distribution of the estate's entire interest in the Company."

Finally, section (c) provides that upon the voluntary or deemed withdrawal of a member, "the Company shall dissolve except with the written consent to continue of all of the other members of record."

## G. The Appian Deal Falls Apart and Cox Removes Walker

### 1. The Events of August 23–24, 1995

REDECO and the Appian Group were scheduled to meet on August 23, 1995 at Appian's offices.[31] To Cox's surprise, Norris did not attend that meeting, sending, instead, a subordinate who did not have authority to close the deal. Also, this subordinate presented an offer that materially differed from that anticipated by Cox. Instead of investing its own funds, Appian proposed to commit only to seek out a syndicate of outside investors in the Moldovan concession venture. After Cox sent Walker to bring Norris to the meeting and Norris refused, Cox, in Walker's words, "started going ballistic."[32]

Walker tried to calm Cox down, but Cox stormed out of the meeting, furious that after months of negotiations, no deal would

be struck with the Appian Group. Walker followed him out. Cox stated at trial, "After I left the offices Mr. Walker stopped me and said, 'Bill, listen we are going to close this deal. We are going to get the financing. I know we are, because Steve Norris is going to compensate me when we get this deal closed.' "[33]

According to Cox, this was a startling admission that Walker was working for or controlled by Norris, with whom he was supposed to be conducting arm's-length negotiations on REDECO's behalf. Cox asserts that he explained and discussed this admission with Baron and Liedtke. With their assent, he removed Walker.

The removal letter, entitled "Severance Arrangement," "set[ ] forth the arrangement [the three Bills] reached concerning [Walker's] withdrawal as a member of [REDECO]." The letter does not refer directly to Walker's alleged admission or to his relationship with Norris. Instead, it refers in general terms to Walker's poor performance and misconduct, as follows:

Your actions have constituted a breach of trust and have resulted in a loss of faith in your abilities to continue as a member of the Firm. Your actions over the past few months appear to violate Firm policies and prevent us from fulfilling our normal business responsibilities. Accordingly, we have mutually agreed that your membership must terminate immediately so it is clear you are not and cannot be acting on behalf of the Firm.

... [W]e hereby terminate your ownership interest in the Firm. In addition to the numerous actions constituting breach of trust, your financial obli-

---

31. On August 1, Walker sent a letter to another family friend, Styve Pierrepont, of Triumph Resource Corporation, in an effort to find for REDECO an additional financing option. This effort, however, was fruitless.

32. Tr. At 103.

33. Tr. At 271.

gations to the Firm remain outstanding. To this end, we have calculated your share of the Firm's total debt to be $4,179.43. Please pay this sum to the Firm on or before September 1, 1995.

Walker never acknowledged or returned the document to Cox. Instead, his counsel sent Cox a letter dated September 22, 1995, stating that because the Operating Agreement does not provide for involuntary withdrawal of a member, Walker remained an 18% owner of the business. With respect to amounts due, Walker's counsel explained that the Agreement does not require additional capital contributions except pursuant to an "enforceable promise" to pay. This letter requested "documentation of this alleged obligation." Cox made no response.

### 2. Did Walker Make this Admission?

For his part, Walker denies having any "side deal" with Norris and denies ever saying that he did. Norris's deposition testimony on the matter also does not support Cox's recollection. When asked whether Walker would be entitled to some commission or payment if the REDECO transaction had come to fruition, Norris stated, "I honestly don't have any specific recollection of what kind of arrangement, if any—I emphasize that—that we would have had with Mr. Walker for introducing us to REDECO." [34]

The testimony of Baron and Liedtke also fails to support Cox's version of events. Instead, it shows that the decision to terminate Walker was the result of the failure of the negotiations with Norris and The Appian Group, not some newly re-vealed impropriety of Walker's financial dealings with Norris.

Baron's first deposition testimony (given before Cox was deposed) shows no recollection of the alleged August 23 admission. When asked what happened between July 25, when the Operating Agreement was signed, and August 24, when Walker was removed, Baron testified that the problem with Walker was "the same as before. Mr. Walker failed to live up to his arrangements with the LLC in providing professional capabilities, and he failed to live up to his responsibilities." [35] Baron testified that Walker's removal was due to "[h]is failure to bring to closure financing, which he was expressly brought on board for." [36] When specifically asked if there were any reasons for Walker's removal in August that differed from his May removal, Baron stated, "If there were, I'm not privy to those differences. I do not know." [37]

Liedtke's initial deposition testimony, although it reflects a greater concern for Walker's conflict of interest, does not put the spotlight on the alleged August 23 admission. Rather, it reflects his awareness of issues of conflict involving Walker even before July 25. When asked why Walker was removed from REDECO on August 24, Liedtke explained that:

"It was a cumulative thing. I think the concerns I had were, as to his fiscal and personal responsibility which—and the fact that in an LLC it put the enterprise at jeopardy. I think there were the additional aspects of his relationship with Norris and the fact that he didn't under—that there was a conflict there

34. Norris Tr. At 39.

35. Baron Dep. at 140.

36. *Id.* at 141.

37. *Id.* at 141–42. Baron's subsequent deposition, held eight months after Cox's, still does not mention Walker's alleged "admission of

guilt." Discussing Walker's removal, Baron stated, "I understood from Bill Cox that he found him unreliable, unprofessional, not able to meet his obligations. That's basically the gist.... [H]e did not follow through on what he said he was going to do as far as financing ...." Baron Dep. Aug. 31, 1999, at 47.

and he had—an undisclosed conflict. And it was kind of a[n] accumulation of a number of different events . . . ." [38]

Liedtke discussed Walker's receipt of compensation and/or payment for expenses from Norris, but did not specify whether he focused on what he learned in May or some later date. Although he discussed the conflicts, and indicated that after July 25 "there appeared to be further evidence" that Walker's conduct was not in REDECO's best interests, Liedtke did not mention a conversation between Cox and Walker immediately following Cox's recognition that Norris would not provide financing. Asked to be specific in his explanation of why Walker was removed, Liedtke simply stated that "it was a cumulative process that had I been consulted [in late May], I would not have been in favor of his being re-involved with the membership." [39]

At trial, Baron explained that at the August 23 meeting with Appian, "[t]here was a failure in financing. No financing was coming forward. In other words, Mr. Walker did not deliver." [40] Baron added conveniently that he learned "that there was a huge conflict of interest. Bill Cox talked to me about the fact that Mr. Walker was on the payroll of Appian, which was in business a complete conflict of interest. He couldn't be kept on as a company partner." [41] He did not explain why he failed to mention this "huge" conflict of interest in his earlier testimony.

Liedtke testified at trial (more consistently with his deposition) that he agreed with the decision to remove Walker, specifically because he had "growing concerns about Mr. Walker as time had gone on. He didn't seem to have much of a business

perspective and I was concerned as to the way he conducted himself. And it was— this kind of proved the point to me that that was going to be consistently the manner in which he might act and so therefore I agreed." [42]

## H. The Escrowed Stock of a Canadian Corporation Represents the Three Bills' REDECO Interest

REDECO eventually obtained financing from Costilla Corp., a company with which Liedtke's brother was affiliated. Although Walker argues that the terms upon which Costilla made its investment in REDECO were worse than those offered by Appian on August 23, he made no further showing that the deal was less than arm's-length, and I see no reason to question the bona fides of that transaction.

A series of financing transactions eventually led to the exchange of the three Bills' REDECO holdings (via interests in other companies) into shares of a Canadian corporation holding a 12.5% interest in any future profits that might be earned by REDECO from the Moldovan concession after various other investors receive their return. Specifically, REDECO Energy, Inc., a publicly traded corporation listed on the Alberta stock exchange, holds the 12.5% future profits interest. The three Bills' only remaining connection with REDECO is through shares in REDECO Energy, which, pursuant to Canadian law, are held in an escrow account and will remain in escrow until the company meets certain performance benchmarks. To date, the company has failed to meet any of those benchmarks.

Liedtke testified that before the three Bills' finally exchanged their memberships

---

**38.** Liedtke Dep. at 112.

**39.** Liedtke Dep. at 119.

**40.** Tr. at 321.

**41.** *Id.*

**42.** Tr. at 347–48.

interests in REDECO for shares in another company, their total capital contributions amounted to $139,000. Plaintiff did not challenge this figure.

## III. THE PARTIES' CONTENTIONS

Walker contends that the three Bills had no right or power to deprive him of his 18% membership interest in REDECO. He also argues that he had no side deal with Norris and never said otherwise to Cox. Thus, he claims, there is no basis on which to argue that the Operating Agreement was the product of fraud or misrepresentation.

Walker's remedy analysis is less complete. Despite a full and fair opportunity to do so, he made no effort at trial to prove the fair value of his 18% interest in RE-DECO. Thus, there is no basis in the record on which to consider an award of money damages. He also made no effort to challenge the bona fides of any of the transactions that have taken place since 1995 and that have substantially altered REDECO's financial structure and the three Bills' interest in it. This failure of proof was not due to a lack of opportunity to engage in relevant pretrial discovery. Indeed, on at least one occasion, I ordered the defendants to provide additional information and deposition testimony on the subject of those transactions. For this reason, I will neither disregard those transactions nor consider restoring Walker's ownership interest in REDECO itself.[43]

These failures of proof do not leave Walker without a remedy. The trial testimony did prove that the stock interests now held by the three Bills in REDECO Energy represent 100% of the original membership interest in REDECO. Thus, while it is not possible to "unscramble the eggs" due to the multiple intervening transactions with third parties, it is still possible to trace Walker's 18% interest in REDECO to the shares now owned by the three Bills in REDECO Energy. This provides a framework on which to consider an award in equity—such as the imposition of a constructive trust on a portion of those shares.

As for defendants, they claim, first, that immediately upon learning of Walker's compensation arrangements with Norris, they removed him from REDECO for that reason. Their justification for this form of self-help is discussed below. Defendants' second theory is that because of Walker's failure to honor his required capital contributions, they were entitled under the Operating Agreement to reduce his ownership interest to zero. Finally, defendants claim that because of Walker's material omissions, relating to his arrangements with Norris, the Operating Agreement was voidable and the August 24, 1995 removal letter constituted a rescission of that contract.[44]

**43.** I am also unwilling to agree to Walker's post-trial suggestion that a second trial be held on damages. I most likely would have denied even a timely-made request to bifurcate the trial of the issues of liability and damages because this case did not present any difficulty in trying all issues at once. Certainly, it would be highly unfair to defendants and unduly burdensome to the court to reconvene trial in order to hear evidence that the plaintiff has already had a full and fair opportunity to present.

**44.** Actually, defendants filed six counterclaims, as follows: (I) Breach of the Feb. 8, 1995 Agreement: (II) Fraudulent inducement into that contract; (III) Breach of Articles XIX and XX of the July 25, 1995 Operating Agreement; (IV) Fraudulent Inducement as to that Agreement; (V) Breach of fiduciary duty in not disclosing his conflict of interest with Norris; and (VI) Declaratory judgment confirming Walker's removal from the entity as of August 24, 1995. Defendants seek $25 million in damages for Walker's alleged breaches. Each of these claims are mooted or re-

## IV. ANALYSIS

■ Defendants focus on Walker's alleged admission that he stood to be paid by Norris when the deal with Appian closed. They say that this admission caused them to remove him from the company. I conclude, however, that the failure of negotiations with Norris—not any "admission" by Walker—was the actual cause of Walker's removal. The fact is that the three Bills willingly overlooked a multitude of issues relating to Walker's participation in the deal as long as they thought The Appian Group would provide financing. It is only because that prospect vanished and Walker's relationship to Norris no longer mattered that Cox and the others decided to throw him out.

### A. Walker Was Removed Because He Failed to Obtain Financing

Cox and Baron brought Walker into REDECO for the sole purpose of raising money. They learned early on that Walker could provide no benefits to REDECO beyond his name and his very valuable family-related connections. They knew, in considerable detail, of Walker's personal problems *and* close relationship with Norris *long before they signed the July 25, 1995 Operating Agreement.*

Defendants make the inexplicable assertion that "at the time they signed the Operating Agreement, the three Bills did not know, and had no reason to know, that Walker was indebted to Norris personally and that Norris had promised Walker a success fee upon closing of any financing deal with REDECO." [45] The record is to

the contrary. The three Bills unquestionably knew in May that Norris was financing Walker's extravagant expenses. Perhaps they did not know the exact figure owed, but they still knew that Walker was financially irresponsible and facing cash-shortages. Thus, any material amount owed Norris should have (and according to Liedtke's deposition testimony did) cause them concern about his independence. [46]

So long as a deal with Norris was likely, which Cox believed was the case until August 23, 1995, the three Bills were willing to look beyond Walker's weaknesses and problems. Ironically, the testimony is that they executed the Operating Agreement confirming his membership interest, in part, to ensure that the LLC would be recognized as a legal entity in order to shield them from liability for Walker's conduct. In this way, Walker could provide the benefit of introducing REDECO to a financing source without exposing his "partners" to personal liability for his misconduct.

Cox went to the August 23 meeting thinking he had "a closing that was imminent" with the Appian Group. [47] Cox was furious when Norris refused to appear and had his lieutenant propose a new deal. Cox stormed out of the meeting. The next day, Cox delivered to Walker a letter purporting to remove Walker from REDECO. From my review of the evidence as a whole, I conclude that Cox and the others took this step solely or primarily because Walker failed to deliver a source of financing.

---

solved by my analysis, except for Count II. I do not consider that claim beyond noting that to the extent that Walker fraudulently induced Cox and Baron, the February 8 Agreement expired by its own terms on March 30, 1995, and defendants/counterclaimants showed no damages resulting from it.

**45.** Def. Post–Trial Br. at 25.

**46.** Liedtke Dep. at 87–88.

**47.** Tr. at 286.

## B. The August 24, 1995 Removal Letter Did Not Remove Walker From His Membership In REDECO

The three Bills had no authority to unilaterally remove Walker from the LLC on August 24, 1995. Neither the Operating Agreement nor the law provides any mechanism for removal of a member in these circumstances.

### 1. The Operating Agreement Does Not Provide For Removal

Delaware's Limited Liability Company Act is codified at 6 *Del. C.* Ch. 18. "The basic approach of the Delaware Act is to provide members with broad discretion in drafting the [Operating] Agreement and to furnish default provisions when the members' agreement is silent." [48] "Once members exercise their contractual freedom in their limited liability company agreement, they can be virtually certain that the agreement will be enforced in accordance with its terms." [49]

As Chief Justice Veasey said *Elf Atochem*, "[T]he following observation relating to limited partnerships applies as well to limited liability companies:

> The Act's basic approach is to permit partners to have the broadest possible discretion in drafting their partnership agreements and to furnish answers only in situations where the partners have not expressly made provisions in their partnership agreement. Truly, the partnership agreement is the cornerstone of a Delaware limited partnership,

and effectively constitutes the entire agreement among the partners with respect to the admission of partners to, and the creation, operation and termination of, the limited partnership. . . ." [50]

Thus, LLC members' rights begin with and typically end with the Operating Agreement. The Operating Agreement includes no provision that can be read to allow the three Bills to deprive Walker of his ownership interest in the circumstances presented in this case. Article X deals with removal of the Manager but makes clear that "removal shall be without prejudice to the [Manager's] contract rights," *implicitly including his ownership rights.* Article XXII, does address the voluntary and involuntary withdrawal from membership but identifies no instance even arguably applicable in this case. The absence of such a provision is surprising, considering what the three Bills knew about Walker at the time they entered into this agreement.[51] They knew that he had embarrassed the company, experienced bouts of drunkenness and alcohol abuse, misrepresented his sophistication in financing transactions *and borrowed money from the very person with whom he was supposed to be negotiating on REDECO's behalf.* Most importantly, they knew or had every reason to know that if the Appian deal fell through, they could not rely on Walker to find an alternative source of financing for REDECO.

Thus, the three Bills could easily have protected themselves in the Operating

---

**48.** *Elf Atochem North America, Inc. v. Jaffari,* Del.Supr., 727 A.2d 286, 291 (1999).

**49.** 2 R.F. Balotti & J.A. Finkelstein, *The Delaware Law of Corporations & Business Organizations,* § 20.4 (2000) (hereinafter "Balotti & Finkelstein").

**50.** *Elf Atochem,* 727 A.2d at 291 (quoting from Martin A. Lubaroff & Paul Altman, *Delaware Limited Partnerships,* § 1.2 (1999)).

**51.** The absence of any provision tying Walker's continued equity participation to his success in obtaining financing also stands in contrast to the terms of the February 8, 1995 agreement, which included specific terms for termination and involuntary removal in the event Walker failed to obtain financing for REDECO.

Agreement against the failure of negotiations with Norris by simply making Walker's REDECO interest contingent on successfully closing a deal with Appian. They failed to do so for reasons that are unexplained. Since the Operating Agreement does not justify Walker's removal, defendants are left to the default rules.

### 2. There is No Basis in the Law for Unilateral Removal of an LLC Member

Defendants make the troubling argument that, although there is no basis for doing so in the Operating Agreement, under applicable law the three Bills had the inherent power to remove Walker from the entity, taking away his ownership interests therein, due to his alleged breach of fiduciary duty. In their post-trial brief, defendants identified virtually no legal support for this proposition. After I noted the lack of legal authority at oral argument, defendants directed my attention to *Lloyd v. Horn, Inc.*, an opinion of the United States Court of Appeals for the Tenth Circuit.[52]

*Lloyd* is plainly distinguishable from the present case and does not, in any case, support defendants' legal argument. In that case, Lloyd, who had acted as managing partner of the business for several years, announced soon after the partnership converted to a limited liability company that he would terminate his employment with the business (by declining to accept the position of Managing Member) but keep his ownership interest in the new entity. The other members then purported to remove him from the LLC and eliminate his ownership interest.

The prior partnership agreement in that case "expressly limited the amount Lloyd, as Managing Partner, could realize from his partnership interest should he withdraw or be fired from the partnership. Under the terms of the partnership agreement, if Lloyd withdrew or was fired as Managing Partner, his partnership interest would be valued at the amount of his capital account plus all undistributed earnings through the effective date of withdrawal or termination." The LLC operating agreement incorporated virtually the same restriction on the value of the Managing Member's interests, *but failed to require that Lloyd take that position*. Thus, a conflict arose when Lloyd refused to take the position from the outset and claimed a standard member's ownership interest.

The district court rescinded the LLC agreement, on the basis of unilateral mistake and constructive fraud, and determined that the parties' rights were still controlled by the prior partnership agreement, i.e., Lloyd's interest was based on his capital contributions. The court of appeals affirmed the district court's order for equitable rescission and its decision that the parties' rights rested on the prior partnership agreement. Neither court recognized any inherent right on the part of the other members to "fire" Lloyd from the entity or take away his ownership interest.

Defendants also claim that "both the Delaware statutes and authority from other jurisdictions provide that a Chancery Court should uphold the removal of a member or partner when the equities so dictate."[53] For this they cite 8 *Del. C.* § 18–1104, which simply states that the rules of law and equity govern where the statute is silent, and two plainly distin-

---

**52.** 166 F.3d 1221 (10th Cir.1998) (TABLE). *Lloyd* is not only an unpublished opinion, it includes an introductory note explaining that "[t]his order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel."

**53.** Supp. Post Tr. Br. at 4.

guishable cases decided by New York state and federal courts.[54] None of these authorities vary the fundamental principle under Delaware law that a majority of the members (or stockholders) of a business entity, unless expressly granted such power by contract, have no right to take the property of other members (or stockholders). Other mechanisms may be available to them to recast their business relations to eliminate persons from the enterprise, such as the merger provisions of the various business entity laws. But, these provisions do not provide for the forfeiture of economic rights, requiring instead that the persons whose interests are eliminated are entitled to receive fair value therefor.

## C. Walker's Interest in REDECO Was Never Diluted to Zero

Defendants also argue that even if Walker's alleged failure to disclose his conflict of interest did not warrant his removal, his failure to make capital contributions did. Defendants point out that under Article XII(c) of the Operating Agreement, each member was required to contribute to the company's costs and expenses. Defendants then assert that under Article XIX, a member has an absolute obligation "to perform an enforceable promise" to make contributions. Under Article XX, failure to honor such an "enforceable promise" entitles to entity "to reduce the defaulting member's ownership in a proportion that the amount of the default bears to the total contribution of the member." Hence, defendants argue that Walker's total capital contribution of $700 was far outweighed by the contributions that he refused to make

and the "cost, time and disruption that he caused." [55]

Defendants' problem is two-fold. First, the term "enforceable promise" is undefined. I assume it does not mean that anytime Cox made a call for contributions, all of the members were required to pay immediately. Defendants failed to show that Walker ignored an enforceable promise by not making the capital contributions, principally because they provided little or no evidence of how the three Bills made their own contributions. Baron testified that at least part of his own contribution consisted of expenses for which he sought no reimbursement, and conceded that he did not keep receipts of those expenses. Although Cox (and, perhaps, Liedtke) contributed his own funds to REDECO before August 24, 1995, defendants have not explained when the other members made an "enforceable promise" to contribute a particular amount of money by a particular date.

Defendants' second problem is more important. The August 24, 1995 Removal Letter never mentions Walker's failure to honor any such promise *as a basis for his removal.* Rather, his alleged "breach of trust" is the basis for the removal. The letter simply adds insult to injury by, after announcing Walker's removal, asserting that his financial obligations remain outstanding and demanding payment of his share of the firm's total debt, or $4,179.43. For these reasons, even if defendants *could* reduce Walker's interest on account of his owing money to the company, they did not purport to do so and will not now

**54.** *Curley v. Brignoli Curley & Roberts Assoc.,* 746 F.Supp. 1208 (S.D.N.Y.1989) (ordering removal of general partner who breached his fiduciary duties from managerial role, pending appointment of a receiver and limited partners' determination of whether to continue venture); *May v. Flowers,* 106 A.D.2d 873, 483 N.Y.S.2d 551 (N.Y.A.D.1984), *appeal dismissed,* 64 N.Y.2d 611, 491 N.Y.S.2d 1025, 480 N.E.2d 749 (1985) (granting dissolution of limited partnership and rescission of agreement based on breach of fiduciary duty by general partner rendering partnership's continued operation unfeasible).

**55.** Def. Supp. Post–Trial Br. at 12.

be heard to rely on that ground as a justification for their actions.

### D. The August 24, 1995 Removal Letter Could Not Act as Rescission of the Operating Agreement

Defendants' final position, contained in their supplemental post-trial brief, is that Walker fraudulently induced the three Bills to enter into the July 25, 1995 Operating Agreement. According to defendants, this fraud either permitted the three Bills to remove Walker and otherwise continue the enterprise or bars any recovery by him.

■ The elements of a fraud claim are: (1) a false representation, typically of fact; (2) knowledge of the falsity of the statement or reckless indifference thereto; (3) intent to induce the victim to act or refrain from acting; (4) justifiable reliance on the representation; (5) damages.[56] The Supreme Court has recently reaffirmed the principle that to constitute fraud, the representation must not only be material, it must also "concern 'an essential part of the transaction.' "[57]

Defendants' misrepresentation claim rests on an alleged omission. Although parties are generally entitled to maintain silence when negotiating a contract, a failure to voluntarily disclose information in certain instances amounts to misrepresentation.[58] The only such instance relevant in this case is the prior existence "of a relation of trust and confidence between" Walker and the three Bills.[59]

It is arguable that after they removed him in May, Walker owed no duties whatever to the three Bills or to REDECO. At that juncture, he owned 18% of the company's equity, but had no employment with the entity and had no opportunity to act for it in a representative capacity. Defendants have convinced me, however, that Walker's reinstatement and subsequent involvement in the business of REDECO, albeit quite limited in scope, involved a relationship of trust and confidence. Thus, I agree that Walker's failure to disclose a material fact, such as a material conflict of interest, if relied on by the three Bills, could amount to a misrepresentation of fact.

Nevertheless, the misrepresentation claim fails for several reasons. First, defendants have not met their burden of proof as to Walker's alleged admission about an improper fee arrangement with Norris. Although Cox testified to Walker's alleged admission, there is little contemporaneous evidence to show that it occurred as he now remembers. Neither Baron nor Liedtke remembered much about it. Walker denies both that he said what Cox says he remembers hearing or that there was, in fact, an undisclosed fee arrangement with Norris. Norris denies such an arrangement. Importantly, the August 24 letter Cox prepared giving Walker the reasons for terminating his connection with REDECO does not refer to the alleged admission that defendants now argue was the critical factor supporting their actions.

The second related problem with the misrepresentation claim is the absence of reliance. The three Bills knew, as far back as May, that Walker had a close relationship with Norris, including a sub-

**56.** See Stephenson v. Capano Dev., Inc., Del. Supr., 462 A.2d 1069, 1074 (1983).

**57.** E.I. DuPont De Nemours & Co. v. Florida Evergreen Foliage, Del.Supr., 744 A.2d 457, 462 (1999) (quoting Nye Odorless Incinerator Corp. v. Felton, Del.Super., 162 A. 504, 512 (1931)).

**58.** See Restatement (Second) of Contracts § 161 (1981).

**59.** Id. at § 161(d).

stantial indebtedness. Long before they signed the Operating Agreement, the three Bills unquestionably realized that in light of Walker's alcoholism, financial irresponsibility and debt to Norris, they should not expect him to serve in any real capacity as their representative in dealings with The Appian Group.

Based on my assessment of the testimony and other evidence of record, I conclude that the only reason that Walker received 18% of the entity was because Norris wanted it that way and the three Bills thought that funding from Appian was a sure thing. They were wrong and did not protect themselves for the possibility of being wrong. Thus, I conclude that their assent to the Operating Agreement was not made in reliance on any understanding that Walker was independent of Norris.

### E. Walker's Remedy

■ Defendants raise in their supplemental post-trial brief, for the first time, the claim that the LLC statute protects the three Bills from personal liability for their effort to appropriate Walker's REDECO interests. In that regard, defendants cite to § 18–1101 of the LLC act, which provides that "[t]o the extent that . . . a member or manager or other person has duties . . . and liabilities relating thereto to a limited liability company or to another member or manager . . . [that person] shall not be liable . . . [for that person's] good faith reliance on the provisions of the limited liability company agreement." [60]

Even if the three Bills believed that they were entitled to take away Walker's membership interest, they have failed to adduce any proof that they formed such a belief in reasonable reliance on any provision of the Operating Agreement. Indeed, no provision of that agreement could support such a belief.

I also have no doubt that the cited statute is not intended to bar Walker from recovering his property from those who purported to take it from him. First, all I conclude here is that the August 24, 1995 letter did not have the effect of depriving Walker of his interest in REDECO. Thus, when they later dealt with REDECO as if they owned 100% of its membership interest, the three Bills were each dealing with Walker's property in proportion to their relative ownership interests in REDECO. Thus, in concluding (as I do, *infra*) that they hold a portion of the property they have subsequently received in exchange for 100% of the equity interest in REDECO subject to a constructive trust in favor of Walker, I am not ordering them to relinquish anything that they ever owned.

Further, I must view the cited provision allowing members of an LLC to rely in good faith on the terms of the operating agreement in the context in which it appears in the statute, and with regard to the general tenor of the statute as a whole.[61] This provision is intended, for example, to make clear that an apparent limit on liability for breach of fiduciary duty is to be interpreted broadly. I have no doubt that the legislature never intended this provision to allow the members of an LLC to misappropriate property from another member and avoid returning that property or otherwise compensating the wronged member.

As previously discussed, there is no proof before me of the value of Walker' 18% interest at any time. Thus, there is

60. 6 *Del. C.* § 18–1101.

61. *See Elf Atochem North America, Inc. v. Jaffari,* Del.Supr., 727 A.2d 286, 289–91

(1999) (viewing the policy of the act as a whole, partly in light of "awkward," "prolix" and "oddly organiz[ed]" structure of its individual provisions).

no basis on which to enter an award of damages. Nevertheless, this does not mean that Walker is not entitled to some remedy because the evidence at trial established that the value of 100% of RE-DECO's membership interest held as of August 24, 1995 by the three Bills and Walker is now represented by the shares of REDECO Energy, Inc. owned by the three Bills. Subject to the following discussion, Walker is entitled to 18% of those shares, from each of the Bills in proportion to his relative interest, and, to that end, I will impose a constructive trust on those shares in his favor.

Of course, the terms of such a trust must reflect the reality that in the period of time since Walker was purportedly expelled, the three Bills have had to meet substantial capital calls to maintain their (and Walker's) economic position. Had they not done so, Liedtke testified, they would have been "drilled out or squeezed out" of the deal. The evidence shows that the three Bills contributed $139,000 "net of everything" since August 24, 1995. Had Walker been allowed to retain his 18% share in REDECO, he would have had to pay his share of REDECO's accrued debt, both the $4,179.43 he owed prior to August 24, 1995, plus an additional $25,020.00, representing 18% of the $139,000 expended by the three Bills after that date, for a total of $29,199.43 plus interest. If he is to recover his proportionate share of the REDE-CO Energy stock, he will be required to pay that amount in exchange therefor.[62]

## V. CONCLUSION

For the reasons and to the extent set forth herein, I will enter judgment in favor of plaintiff and against the defendants. Counsel are instructed to confer and present an order in accordance with this Opinion within thirty (30) days of this date.

---

62. Since the record does not reflect the timing of the three Bills' investments, no interest will be added to the $29,199.43.