SUPERWIRE.COM, INC., a Nevada corporation, Tighe Merelli, Mitchel May, James Truher, Richard Macary, Jeffrey Jakubiak and Entrata Communications Corporation, a Delaware corporation, Plaintiffs,

v.

Dean HAMPTON, Ahmad Fauzi Saad, and Angelo Compagnoni, Defendants.

Civ. A. No. 19316.

Court of Chancery of Delaware, New Castle County.

Submitted: Feb. 13, 2002.
Decided: March 18, 2002.

Lawrence C. Ashby, Richard D. Heins, Philip Trainer, Jr., Richard I.G. Jones, Jr., Ashby & Geddes, Wilmington; Michael A. Lynn, Kay Scholer, LLP, New York City, for Plaintiffs.

Robert K. Payson, Peter J. Walsh, Jr., Kevin R. Shannon, Potter Anderson & Corroon, Wilmington, for Defendants.

## OPINION

LAMB, Vice Chancellor.

### I.

This action under Section 225 of the Delaware General Corporation Law ("DGCL") is brought to determine the composition of the board of Entrata Communications Corporation ("Entrata"), a Delaware corporation with its principal place of business in Connecticut. Defendants Dean Hampton, Ahmad Fauzi Saad, and Angelo Compagnoni (collectively "De-

fendants") were directors of Entrata before the events described in the complaint.[1]

Plaintiffs Tighe Merelli, Mitchel May, James Truher, Richard Macary, and Jeffrey Jakubiak claim they constitute the board of directors of Entrata.[2] With the exception of Jakubiak, they are also directors of plaintiff Superwire.com, Inc. ("Superwire"). Superwire is a Nevada corporation with its headquarters in California. Superwire claims to be the holder of, or entitled to hold, 51% of Entrata's voting power. Superwire also claims to be a senior secured creditor of Entrata.

This litigation concerns the validity of two written stockholder consents delivered by Superwire to Entrata purporting to authorize changes in the composition of the board of directors of Entrata. If those consents were valid expressions of the will of a majority of the Entrata voting securities, then Merelli and the other individual plaintiffs constitute the duly elected board of directors. If not, the defendants are still in control of the company. Superwire concedes that it does not own a majority of *all* issued and outstanding voting shares but claims that it does own a majority of *all validly* issued and outstanding voting shares. This is so, it claims, because a number of voting shares issued by Entrata in violation of certain provisions of the certificate of designation governing a class of preferred shares held by Superwire are void and of no effect.

This opinion will consider the legal status of those shares and other issues relating to the validity of the written consents executed by Superwire.

### Background Facts [3]

On September 24, 1998, Superwire and Entrata entered into a loan and option agreement (as amended, the "Loan and Option Agreement") pursuant to which Superwire agreed to provide $2 million of financing to Entrata in exchange for an option to purchase 51% of the outstanding stock of Entrata.[4] On June 1, 1999, Entrata and Superwire entered into an amended version of the Loan and Option Agreement pursuant to which Superwire agreed to loan Entrata an additional $6 million.[5] At the same time, the parties entered into a stock purchase agreement (the "Stock Purchase Agreement") by which Superwire exercised its option to purchase 51% of the stock of Entrata: acquiring 3,479,843 shares of Series D Preferred Stock. The Series D shares were issued pursuant to a certificate of designa-

---

1. Before the events described in the complaint, Hampton was CEO, President, Secretary and Chairman of the board of directors of Entrata; Saad was an officer of an affiliate of Entrata and served as a member of Entrata's board; Compagnoni was Vice President of Entrata and served as a member of Entrata's board.

2. Merelli is CEO and President of Superwire, claims to be a director of Entrata, and, subsequent to the purported termination of defendants' employment, claims to have been appointed Entrata's CEO, President, Secretary and Treasurer. May is an officer and director of Superwire and claims to be a director of Entrata. Truher is an officer and chairman of the board of directors of Superwire and claims to be a director of Entrata. Macary is a director of Superwire and claims to be a director of Entrata. Jakubiak claims to be a director of Entrata.

3. Except where otherwise noted, the facts recited are taken from the allegations of the complaint.

4. Under the terms of this agreement, Entrata was to provide Superwire with certified financial statements and other documents it reasonably required within 90 days of the end of each fiscal year.

5. One condition of the additional funding was Entrata's commitment to submit to Superwire detailed budgets, including revenue projections.

tion (the "Certificate of Designation"), which Superwire contends entitles it to maintain a share ownership level having not less than fifty-one percent (51%) of the voting power of all Entrata securities.

The parties also entered into a stockholders agreement (the "Stockholders Agreement") which provided, among other things, that the stockholders who were parties thereto would vote their shares to cause the Entrata board to consist of seven designated members.[6]

The complaint alleges that Entrata soon began to breach the Loan and Option Agreement by failing to provide the budget information required of it. When Superwire refused to advance funds on account of Entrata's alleged breach, Hampton refused to acknowledge the Superwire designees on Entrata's board and also asserted that the 51% of Entrata stock purchased by Superwire was not validly issued due to Superwire's defaults under the Loan and Option Agreement.

On February 16, 2000, the parties entered into a letter agreement (the "February 2000 Letter Agreement"). This letter provided, among other things, that Entrata recognized Superwire's ownership of 3,479,843 shares of Series D Preferred Stock and 100,000 shares of Series C Preferred Stock constituting 51% of the Company's outstanding voting stock.

During the next year, disputes arose that were nearly identical to those that had erupted the year before. Entrata again demanded funds which Superwire refused to provide because, it claimed, the necessary budgetary disclosures had not been made. Hampton again disputed both the membership of the Superwire designees on the Entrata board and Superwire's 51% ownership of Entrata. Of particular pertinence to the present complaint, Entrata also issued additional voting stock (together with later-issued shares, the "Extra Shares"), allegedly without complying with the provisions of the Certificate of Designation giving Superwire the ability to maintain its 51% voting position.

On February 16, 2001, the parties entered into a six month standstill agreement (the "Standstill Agreement") pursuant to which they agreed to forebear from acting on any alleged breaches of either party occurring up to that point. Entrata again acknowledged Superwire's legal ownership of 3,479,843 shares of Series D Preferred Stock and 100,000 shares of Series C Preferred Stock of Entrata. Entrata also acknowledged Superwire's entitlement to, and agreed to issue to Superwire within thirty days, 103,451 additional shares of Series D Preferred Stock, "representing shares due to Superwire under the anti-dilution provisions of the Transaction Documents with regard to ESOP shares exercised."[7] The Standstill Agreement memorialized Superwire's waiver of its anti-dilution protections in certain defined circumstances,[8] and provided for a

---

6. Among them: (i) two designees of Superwire, (ii) two members consisting of Hampton and Compagnoni or their designees, (iii) one designee of BTR Entrata, LLC ("BTR–LLC"), and (iv) two appointees mutually agreed upon by (1) Superwire and (2) Hampton, Compagnoni and BTR–LLC as a group. (BTR Entrata LLC is a substantial stockholder in and an affiliate of Entrata.)

7. Standstill Agreement, Section I.1.i. This document is incorporated by reference in the complaint.

8. Section I.1.f of the Standstill Agreement provides, in pertinent part, as follows:

Superwire agrees to waive its anti-dilution protections to maintain its 51% interest under the Transaction documents with respect to (1) additional shares of Common Stock issued to officers, directors and employees under the Company's incentive plan that

five-member board, two each designated by Entrata and Superwire and the fifth by BTR–LLC. The Standstill Agreement terminated in August 2001.

The complaint alleges that Entrata promptly breached the Standstill Agreement. It claims that Entrata did not recognize Superwire's board designees, and did not provide Superwire with the required certified annual financial statements. In addition, the complaint alleges that Entrata did not issue the promised stock as it had agreed it would.[9]

### The First Consent

On November 8, 2001, Superwire joined with other Entrata shareholders to execute an action by written consent of the holders of a majority of Entrata's voting stock purporting to remove Hampton from the board of directors "for cause." The complaint alleges that Superwire delivered the consents to Entrata and that "Hampton's removal was, therefore, effective on that date." The complaint further alleges that Hampton claims to have received revocations of consents from those stockholders other than Superwire who executed the November 8, 2001 consent and that Hampton and others claim to "have executed a consent of the holders of a majority of Entrata stock to maintain Mr. Hampton as a director."

### The Second Consent

On December 12, 2001, Superwire delivered a second written consent to Entrata, purporting to remove all directors other than May and Merelli and electing Truher, Macary and Jakubiak to the board. The

purportedly constituted board of directors then acted to terminate the employment of Hampton, Compagnoni and Wilkinson. They also acted to appoint Merelli CEO, President, Secretary and Treasurer of Entrata. The complaint provides no details about this consent; however, it is apparently undisputed that Superwire acted alone in expressing the December 12 consent, purporting to exercise a majority of the voting power of Entrata.

Both the effectiveness of Superwire's December 12 consent and its challenge to the consent allegedly executed by Hampton and the others turn on the same issue. Namely, is Superwire, by virtue of the anti-dilution provisions of the Certificate of Designation for the Series D Preferred Stock, the owner of a majority of the Entrata voting stock? This issue, in turn, depends on the legal status of the Extra Shares allegedly issued by Entrata in violation of those provisions. If those shares are void, as Superwire contends, Superwire is the majority stockholder, and the December 12 consent must be given legal effect. If not, the December 12 consent was ineffective, in which case the effectiveness of the other two consents remains at issue.

### Procedural Posture

Plaintiffs filed this Section 225 action on December 14, 2001, with a Motion to Expedite and a Motion for Status Quo Order. Plaintiffs seek a declaration that: (i) Hampton, Saad and Compagnoni were removed from Entrata's board by written consent of Entrata's shareholders and

---

are listed in Exhibit B, (2) shares of Common Stock issued to vendors, consultants, or other creditors as listed in Exhibit B, and (3) shares issued and to be issued in connection with financing activities to raise up to $6,000,000 at a per share price no less than the highest price paid by Superwire for D Preferred Stock.

**9.** The complaint also alleges that there was a mathematical error made in computing the number of shares to be issued to Superwire pursuant to the Standstill Agreement. Apparently, even that number was inadequate to bring Superwire's total number of voting shares back over a majority.

were replaced by Truher, Macary and Jakubiak, (ii) Entrata's reconstituted board subsequently removed Hampton, and Compagnoni as officers of Entrata, and (iii) Merelli was validly appointed to fill those offices.

On January 2, 2002, I heard arguments from counsel for plaintiffs and defendants Hampton, Saad and Compagnoni regarding the status quo motion. During that hearing, the parties agreed that defendants' motion to dismiss would be briefed and decided before the parties engaged in any discovery.

On January 11, 2002, defendants Hampton, Saad and Compagnoni moved pursuant to Rule 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted.

On January 23, 2002, plaintiffs cross-moved for summary judgment.

## II.

On a motion to dismiss under Court of Chancery Rule 12(b)(6), the court must assume the truthfulness of the well-pled allegations of the complaint and draw all reasonable inferences therefrom.[10] A complaint will not be dismissed unless it can be determined with reasonable certainty that the plaintiff could not prevail on any set of facts reasonably inferable from the complaint's allegations.[11] Finally, the court must give the pleader "the benefit of all reasonable inferences that can be drawn from its pleading."[12]

A motion for summary judgment will be granted when no genuine issue of material fact is in dispute and the moving party is entitled to judgment as a matter of law.[13] The moving party has the burden of establishing to the satisfaction of the Court the absence of any genuine issue of material fact, and any doubt regarding the existence of such an issue will be resolved against the movant.[14] Moreover, the interests of judicial economy dictate that, "[t]he form of the pleadings should not place a limitation upon the court's ability to do justice."[15] Court of Chancery Rule 56 gives this court the inherent authority to grant summary judgment against a party seeking summary judgment when the state of the record is such that the non-moving party is clearly entitled to such relief.[16]

## III.

I will first address the issue, raised by both the motion for summary judgment and the motion to dismiss, of whether the Extra Shares that numerically reduce Superwire's stock ownership to less than majority voting power are void. This question presents a pure issue of law. If plaintiffs are right on the law in arguing that the Extra Shares are void, then they are entitled to judgment on the validity of the December 12 consent. If not, the December 12 consent is conclusively invalid because that consent was signed only by Superwire which concededly does not hold a majority of all the voting stock issued

10. *Solomon v. Pathe Communications Corp.,* 672 A.2d 35, 38 (Del.1996).

11. *Id.* at 39.

12. *In re USACafes, L.P. Litigation,* 600 A.2d 43, 47 (Del.Ch.1991).

13. *Scureman v. Judge,* 626 A.2d 5, 10 (Del.Ch. 1992).

14. *Nash v. Connell,* 99 A.2d 242, 243 (1953).

15. *Bank of Delaware v. Claymont Fire Co. No. 1,* 528 A.2d 1196, 1199 (Del.1987).

16. *Stroud v. Grace,* 606 A.2d 75, 81 (Del. 1992).

and outstanding.[17]

Superwire begins its argument with the proposition that under the decision of the Delaware Supreme Court in *Staar Surgical*, shares that are issued without compliance with the statutory scheme are void and of no effect. In that case, the corporation purported to issue shares of a new series of preferred stock pursuant to a "blank check" power vested in the board of directors by the certificate of incorporation. However, because the board of directors formally adopted neither the authorizing resolution nor the certificate of designation for the new series of stock, the shares were not validly issued and were void. The Supreme Court held that strict compliance with the technical requirements of Section 151 of the DGCL was necessary for the issuance of stock: "Stock issued without authority of law is void and a nullity."[18]

To a similar effect, Superwire cites the *Triplex* case,[19] in which a Delaware corporation's certificate of incorporation created a class of common stock with no par value, but failed to confer upon the board of directors the power to fix the consideration for the issuance of that stock. Under the statute then in effect, that power could, in that circumstance, only be exercised by the stockholders. But the "stockholders never fixed the consideration for any of the par value stock issued by the corporation after its organization, and there is no escape from the conclusion that all such stock was invalid at the time of the election in question and not entitled to vote."[20] As the *Triplex* court further explained:

> [T]he corporation had no power to issue the kind of stock that was attempted to be issued; the act was void and not merely voidable, and under practically all the authorities, it is incapable of being cured or validated by an attempted ratification by amendment or other subsequent proceeding.[21]

Plainly, however, neither *Staar Surgical* nor *Triplex* directly controls the outcome of the issue presented because Superwire does not allege that the Entrata board of directors failed to comply with any statutory requirement of Section 151 in issuing the Extra Shares. Instead, Superwire first urges the court to interpret the Certificate of Designation as expressly prohibiting the issuance of the Extra Shares and then relies on *Staar Surgical* and *Triplex* as support for the somewhat broader principle that shares issued in contravention of an express prohibition found in the certifi-

---

**17.** Entrata has also raised issues of waiver and estoppel, based on the various settlement and standstill agreements signed by the corporate parties over the years. If Superwire is right in its legal position, I cannot give *any* effect to void shares even in the context of an equitable defense. *Staar Surgical Co. v. Waggoner*, 588 A.2d 1130, 1137 (Del.1991). If Superwire is wrong and the shares are not void, I can dismiss the case without ruling on the substance of these collateral issues.

The court will not consider whether Superwire has a valid contract claim to receive more shares from Entrata. Section 228 requires that the consent be signed "by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present." This can only mean what it says: persons executing consents must actually be the record holders of the shares they purport to vote when they purport to vote them. Any claim Superwire has to compel the issuance of additional shares must be litigated in a separate, plenary proceeding.

**18.** *Staar Surgical,* 588 A.2d at 1136.

**19.** *Triplex Shoe Co. v. Rice & Hutchins, Inc.,* 152 A. 342 (Del.1930).

**20.** *Id.* at 348–49.

**21.** *Id.* at 348.

cate of incorporation are void. It is not necessary to reach the purely legal question posed because the Certificate of Designation does not bear the construction Superwire would give it.

At common law all shares of stock stand on an equal footing. Preferences granted to one class of shares or group of shareholders, because they are in derogation of this common law rule, must be strictly construed.[22] As a result, the standard for interpreting a certificate of designation requires that its language be strictly construed: "Nothing is to be *presumed* in favor of preferences attached to stock, but rather they *must be expressed in clear language.*"[23] Moreover, in interpreting the meaning of charter provisions, "the instrument should be considered in its entirety, and all of the language reviewed together in order to determine the meaning intended to be given to any portion of it."[24] Finally, the rule of strict construction provides that a "court may not presume that [a certificate of designation] grants a right, and instead must resolve any ambiguity against granting the alleged preference or right."[25]

■ Section (c) of the Certificate of Designation, on which Superwire relies to assert its voting power, reads as follows:

The holders of the Series D Preferred Stock and the Common Stock issued upon conversion of the Series D Pre-

ferred Stock collectively *shall, at all times, be entitled to hold* no less than fifty-one percent (51%) of the total number of issued and outstanding shares of capital stock of the Corporation, and no less than fifty-one percent (51%) of all issued and outstanding securities of the Corporation that are entitled to voting rights, on a fully diluted basis. In the event that the Corporation shall issue any shares of its capital stock or any securities entitled to voting rights, or any other securities convertible into shares of capital stock or voting securities, such holders shall, *prior to or concurrently with* any such issuance of additional stock or securities, *be entitled to receive or purchase* such additional number of shares of Series D Preferred Stock or Common Stock of the Corporation as necessary for such holders to maintain the above-described percentages of capital stock and voting securities of the Corporation.[26]

This language does not, clearly or expressly, impose any prohibition on Entrata's issuance of the Extra Shares. Instead, properly construed, the language gives rise at most to a claim on Superwire's part to the right or entitlement to receive additional shares, or the opportunity to purchase such shares, in defined circumstances.[27] This plain language in-

**22.** *Goldman v. Postal Telegraph, Inc.,* 52 F.Supp. 763, 767 (D.Del.1943).

**23.** *Rothschild International Corp. v. Liggett Group, Inc.,* 463 A.2d 642, 646 (Del.Ch.1983), *aff'd,* 474 A.2d 133 (Del.1984) (emphasis added).

**24.** *Ellingwood v. Wolf's Head Oil Refining Co.,* 38 A.2d 743, 747 (Del.1944).

**25.** *Bernstein v. Canet,* 1996 WL 342096 at *3, 1996 Del.Ch. Lexis 63 at *14 (Del. Ch.).

**26.** Certificate of Designation, dated June 1, 1999, Paragraph (c) (Defendants' Exhibit B) (emphasis added).

**27.** Delaware cases addressing claims for breach of anti-dilution or pre-emptive rights provisions do not suggest that stock issued by a corporation in breach of such a provision is void. *See e.g. Bernstein v. Canet,* 1996 WL 342096, 1996 Del. Ch. Lexis 63 (Del.Ch.); *American General Corp. v. Continental Airlines Corp.,* 1988 WL 7393, 1988 Del.Ch. Lexis 19 (Del.Ch.); *CL Invs., L.P. v. Advanced Radio*

terpretation of the relevant provision of the Certificate of Designation is reinforced by reference to Paragraph (h) of the same document that contains exactly the kind of express prohibition on the issuance of shares that Superwire argues should be read into Paragraph (c):

> Without consent of the holders of greater than fifty percent (50%) of the Series D Preferred Stock, the Corporation will not pay any dividend on any Junior Security other than a liquidating or similar dividend permissible hereunder or amend the Corporation's Certificate of Incorporation to change the rights, preferences and privileges of the holders of any Junior Securities or the Series D Preferred Shares. Nor shall the Corporation, without the consent of holders of greater than fifty percent (50%) of the Series D Preferred Stock, issue any series of Preferred Stock with rights or privileges senior to or *pari pasu* [sic] with the Series D Preferred Stock.

Obviously, the drafters of the Certificate of Designation knew how to prohibit share issuances when they meant to do so.

For these reasons, even assuming that Superwire is correct in arguing that shares issued in contravention of an express prohibition found in the charter of a corporation of a Delaware corporation are void, that rule would not serve to invalidate the Extra Shares. The plain wording of Paragraph (c) of the Certificate of Designation does not expressly prohibit anything. That language might support a contract claim by Superwire either to receive or to be afforded the opportunity to purchase additional shares when Entrata issues additional voting shares, such as the Extra Shares. If so, Superwire has been on notice of Entrata's breach of the provision since no later than February 2001. Superwire might have sued to enforce that right.

But it cannot show that shares issued by Entrata without observing that provision are void.

This conclusion leads the court to deny Superwire's motion for summary judgment based on the December 12 consent. Moreover, not only has Superwire failed to prove its entitlement to summary judgment on this issue, but the foregoing analysis and conclusions lead to the result that summary judgment should be entered against Superwire as to all issues relating to the December 12 consent. Since the Extra Shares are not void as a matter of law, it follows that Superwire did not have the right to exercise a majority of the voting power represented by the validly issued and outstanding shares when it expressed that consent.

## IV.

The defendants' motion to dismiss the claim relating to the November 8 consent raises both legal issues that can be resolved at this time and factual issues that must await trial, if there is to be one.

The November 8 consent purports to remove Hampton "for cause." Defendants move to dismiss because the complaint does not allege facts showing that Hampton was afforded notice of specific charges and an opportunity to be heard. Superwire responds that (a) the consent is valid even if no notice or opportunity to be heard was afforded to Hampton because the certificate of incorporation permitted his removal without cause and, (b) in any case, it is not obligated to allege those facts in order to survive a motion to dismiss.

Superwire misstates the law in contending that the fact that it might have proceeded "without cause" can serve to

validate an otherwise invalid attempt to remove Hampton "for cause." Directors of Delaware corporations can be removed "for cause" or, where permitted by the governing documents and the law, "without cause." But there are additional requirements that must be observed when doing so "for cause." A "for cause" removal of a director requires that the individual be given (i) specific charges for his removal, (ii) adequate notice, and (iii) a full opportunity to meet the accusation.[28] The same is true whether the action is taken at a meeting of stockholders or by written consent.[29]

These procedural safeguards are of some importance. In many cases, there are substantial collateral affects of being removed "for cause" that do not attend a removal "without cause." These can include differences in the treatment of rights flowing from contracts or other terms of employment. There are also likely to be significant reputational affects flowing from a "for cause" removal. These consequences alone might justify the conclusion that one choosing to act "for cause" must follow the prescribed procedures.

Moreover, it is a fallacy to suppose that a stockholder who succeeds in obtaining enough consents to remove a director "for cause" without affording the director notice and an opportunity to be heard would necessarily obtain the requisite number of consents if it complies with the law, or even if it seeks to remove the director "without cause." In this case, for example, the complaint reflects a contention that the stockholders who joined with Superwire in executing the November 8 consent promptly executed revocations of those consents, claiming that Superwire misled them into agreeing to remove Hampton. Those revocations may not have been legally effective, since they were expressed after the November 8 consent was delivered to Entrata.[30] But they do serve to illustrate the point that compliance with established legal standards can affect the outcome.

Thus, the validity of the November 8 consent will depend on whether it was solicited in compliance with the procedural safeguards articulated in *Campbell v. Loew's* and specifically applied to actions taken by written consent in *Bossier v. Connell.*

■ For the purposes of the motion to dismiss, however, the question is whether Superwire was obliged to include in its complaint factual allegations that would support a finding that it gave Hampton notice of the charges against him and an opportunity to be heard. The answer to this question must be "no" because it is sufficient under the general notice pleading standard found in Court of Chancery Rule 8(a) that the complaint "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." The allegations found in paragraph 22 of the complaint are sufficient for this purpose because they identify the consent, allege that it was executed by holders of the requisite number of shares, that it was delivered to the corporation and that it was effective on the date of its delivery. These are the elements described in Section 228 of the DGCL. The defense is free to show that the November 8 consent was invalid for whatever reason or reasons may exist. However, there is no require-

**28.** *Campbell v. Loew's, Inc.,* 134 A.2d 852, 859 (Del.Ch.1957).

**29.** *Bossier v. Connell,* 1986 Del. Ch. Lexis 511, at *15 (Del.Ch.).

**30.** *Allen v. Prime Computer, Inc.,* 540 A.2d 417, 420 (Del.1988); *AGR Halifax Fund, Inc. v. Fiscina,* 743 A.2d 1188, 1193 (Del.Ch. 1999); 8 *Del.C.* § 228(c).

ment that the complaint allege facts sufficient to disprove any of those matters.

## V.

For all the foregoing reasons, summary judgment is entered in favor of the defendants as to any claim based on the validity of the December 12 consent. The motion to dismiss the claim relating to the November 8 consent is denied. IT IS SO ORDERED.