**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

JOSEPH R. SLIGHTS III
VICE CHANCELLOR

417 S. State Street
Dover, Delaware 19901
Telephone: (302) 739-4397
Facsimile: (302) 739-6179

Date Submitted: July 12, 2018
Date Decided: July 18, 2018

Kurt M. Heyman, Esquire
Heyman Enerio Gattuso & Hirzel LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801

Stephen B. Brauerman, Esquire
Bayard, P.A.
600 N. King Street, Suite 400
Wilmington, DE 19801

Re: *A&J Capital, Inc. v. Law Office of Krug*
C.A. No. 2018-0240-JRS

Dear Counsel:

This letter opinion addresses Plaintiff, A&J Capital, Inc.'s ("A&J"), motion for summary judgment in which A&J seeks a declaratory judgment that it was improperly removed as manager of LA Metropolis Condo I, LLC ("LAMC" or the "Company"). A majority of the Company's members purported to remove A&J as manager "for cause." A&J's motion for summary judgment posits that, as a matter of contract or as a matter of Delaware common law, prior to removal, the members were required to provide A&J with: (1) a notice of their intent to remove A&J that contained an explanation of the ground(s) for removal, and (2) an opportunity to

respond to the notice. In taking this position, A&J acknowledges that the Company's operating agreement does not expressly contain either condition to "for cause" removal.

For the reasons discussed below, I am satisfied that the common law does not alter or amend the Company's operating agreement with respect to "for cause" removal procedures. Consequently, the motion for summary judgment must be denied.

## I.  FACTUAL BACKGROUND

I have drawn the facts from the admissions in the pleadings and uncontested facts presented in the parties' submissions.[1] I have resolved any doubt as to the absence of a genuine issue of fact in favor of the non-moving party.[2]

### A. The Parties

Plaintiff, A&J, is a California corporation and the designated Class B Manager of the Company pursuant to the Operating Agreement of LAMC (the "Operating

---

[1] *See* Ct. Ch. R. 56(c). Citations to the Complaint will be to "Compl. ¶ __" and to the Def.'s Answer and Verified Countercls. to Verified Compl. will be to "Answer & Countercl. ¶ __."

[2] *Brown v. Ocean Drilling & Expl. Co.*, 403 A.2d 1114, 1115 (Del. 1979).

Agreement") and the Management Agreement by and among LAMC, A&J and the Joined Members (the "Management Agreement"),[3] both dated July 11, 2014 (collectively, the "Agreements").[4] Nominal Defendant, LAMC, is a Delaware LLC that was formed for the purpose of raising immigrant investor capital under the EB-5 visa program administered by the United States Citizenship and Immigration Services.[5] The Company solicited capital from 200 foreign investors, and these investors became Class B Members of the Company.[6] Defendant, Law Office of

---

[3] The Management Agreement defines "Joined Members" to be "[t]hose persons . . . who have joined as a party to this Agreement . . . by entering into a Joinder Agreement . . . and whose details are contained in each respective Joinder Agreement," and "Joinder Agreement" is defined as "the Joinder Agreement to this Agreement in the form as attached hereto." Compl., Ex. 2 ("Management Agreement") at 1–2. A&J represents, and Krug does not dispute, that the Class B Members executed Joinder Agreements. *See* Pl.'s Mot. for Leave to File Verified Am. Compl. 4, Ex. D; Def.'s Answering Br. in Opp'n to Pl.'s Mot. for Leave to File Am. Compl. 1–3, 6–7.

[4] Compl. ¶ 3; Answer & Countercl. ¶ 13; Compl., Ex. 1 ("Operating Agreement") § 5.3(a); Management Agreement § 2(a).

[5] Answer & Countercl. ¶¶ 5, 7, 10.

[6] Answer & Countercl. ¶¶ 2, 12; Operating Agreement at 2; Management Agreement at 1–2.

Krug ("Krug"), is a single-person California law firm appointed as the interim Class B Manager following A&J's purported removal.[7]

## B. A&J's Removal as Class B Manager

The Operating Agreement and Management Agreement contain three removal provisions that are relevant to this dispute. Under Section 4.8 of the Operating Agreement, "the Class B Members, by Majority Vote,[8] shall have the sole and exclusive right to approve or disapprove the following . . . (f) Subject to 5.3, appointment, reappointment and removal, as applicable of any Manager."[9] Pursuant to Section 5.3(c)(ii) of the Operating Agreement, "[t]he Class B Manager may be removed by Majority Vote of the Class B Members for gross negligence, intentional misconduct, fraud or deceit, all as more fully set forth in the Management Agreement."[10] Section 12(b) of the Management Agreement states, in its entirety:

---

[7] Answer & Countercl. ¶¶ 4, 27.

[8] The Operating Agreement defines "Majority Vote" as "Class B Members who, at the time in question, have Percentage Interests aggregating more than fifty percent (50%) of all Percentage Interests held by all Class B Members." Operating Agreement at 3.

[9] Operating Agreement § 4.8(f).

[10] Operating Agreement § 5.3(c)(ii).

> The Class B Manager may be removed by Majority Vote (as defined in the Operating Agreement) of the Class B Members for gross negligence, intentional misconduct, fraud or deceit; provided that in any of such events as specified in this Section 12(b), without limiting any of their respective rights and remedies, the Members shall be entitled to exercise their respective powers under the Operating Agreement to appoint a new Class B Manager and to cause the Company to issue written notice of termination to the Class B Manager hereunder.[11]

These three provisions—Sections 4.8(f) and 5.3(c)(ii) of the Operating Agreement and Section 12(b) of the Management Agreement—comprise the universe of contractual provisions that govern the procedure for removal of the Class B Manager.

On or about March 14, 2018, A&J received a letter (dated March 14, 2018) notifying it that a majority of the Class B Members had voted to remove A&J as the Class B Manager and had appointed Krug as the interim Class B Manager (the "Removal Notice").[12] The Removal Notice states that "[a] majority of the Class B members have, in writing, voted to remove A&J [] as the Class B Manager," but is silent as to the reason(s) for A&J's removal or the details of the Class B Member

---

[11] Management Agreement § 12(b).

[12] Answer & Countercl. ¶ 27.

vote effectuating the removal.[13]  A&J asserts that prior to receiving the Removal Notice, "neither A&J nor the Company received any notice of any alleged default, or of the intent to hold a vote . . . by the Class B Members either to remove A&J or to appoint Krug in A&J's place as Class B Manager."[14]

## C. Procedural Posture

The parties do not dispute that the Agreements specify, in essence, that removal of the Class B Manager must be "for cause."[15]  They do, however, dispute whether the Agreements, on their face, require the Class B Members to deliver to the Class B Manager a notice of intent to remove and provide an opportunity to be heard, prior to removal.  A&J construes the Agreements to require notice and an opportunity to respond to the notice; Krug maintains that no such requirements can be drawn from any of the clear and unambiguous provisions at issue.[16]  Alternatively, A&J argues that Delaware common law, as expressed by our courts

---

[13] Compl., Ex. 3 (Removal Notice) at 1.

[14] Compl. ¶ 29.

[15] Pl.'s Opening Br. in Supp. of its Mot. for Summ J. ("Opening Br.") 16–19; Def.'s Answering Br. in Opp'n to Pl.'s Mot. for Summ. J. ("Answering Br.") 11.

[16] Opening Br. 2; Answering Br. 12–16.

in the context of Delaware corporation law, requires that managers be given notice prior to a purported for cause removal. Not surprisingly, Krug disagrees, principally on the ground that LAMC's governance scheme is a product of the parties' contract (the Operating Agreement), and that scheme cannot be altered by the common law or otherwise without the consent of the parties to the contract.

Regardless of which approach the Court might take—enforcement of a notice requirement as a matter of contract or as a matter of common law—A&J contends that the Court can decide that it was improperly removed as Class B Manager as a matter of law on summary judgment without the need for a trial. I agree that there are no factual issues in dispute with respect to A&J's motion. I disagree, however, with the legal premises of that motion. Simply stated, there is neither a contractual nor a common law basis to impose upon the Class B Members a "notice and response" condition as a predicate to removal of the Class B Manager for cause.

## II. LEGAL ANALYSIS

The court may grant summary judgment only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of

law."[17] "When the issue before the Court involves the interpretation of a contract, summary judgment is appropriate only if the contract in question is unambiguous" and favors the movant's position.[18] If the court construes the "plain-meaning of the contract's terms and provisions" in a manner differently than the construction proffered by the movant, the court must deny summary judgment and enforce the contract as written.[19]

## A. The Agreements Do Not Contemplate Notice and an Opportunity to Be Heard Prior to Removal

As noted, A&J maintains that its right to pre-removal notice is set forth in the Agreements themselves.[20] After carefully reviewing the clear and unambiguous terms of the operative provisions, however, I am at a loss to see where that right is either expressly stated or implied. Indeed, the Agreements say nothing at all about notice or an opportunity to be heard prior to removal. The only "notice" that is required is referenced in Section 12(b) of the Management Agreement, and that

---

[17] Ct. Ch. R. 56(c).

[18] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

[19] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010).

[20] Opening Br. 18.

notice is an after-the-fact notice of termination, not a prior notice of the cause the Class B Members believe they have to justify removal. That the Management Agreement speaks to notice of termination after the Class B Members have voted, but is silent about prior notice and an opportunity to be heard, is meaningful in discerning that the parties did not intend to contract for pre-removal notice.[21]

A&J urges the Court to infer that the procedural protections it seeks are embedded in the Agreements because "the common meaning of being removed 'for gross negligence, intentional misconduct, fraud or deceit' means 'by reason of' or 'due to' those bases," thus requiring notice prior to removal.[22] In the context of non-corporate business entities, however, the entity operating agreement typically will expressly provide for such procedural protections when the parties intend for them

---

[21] *See Haase v. Grant*, 2008 WL 372471, at *3 (Del. Ch. Feb. 7 2008) (noting that the court's construction of the contract at issue was supported by the fact that the parties evidenced their awareness and approach to dealing with certain topics (*e.g.*, notice) in other provisions of their contract).

[22] Opening Br. 18.

to apply.[23]  In the absence of such provisions, the Court will not infer them or rewrite

the contract to include them.[24]

## B. Common Law Cannot Be a Basis to Rewrite the Parties' Agreements

A&J alternatively argues that pre-removal notice is implicit in the Agreements

because that is a *sine qua non* of for cause removal recognized in our common law.

Relying upon *Campbell v. Loew's, Inc.*, *Bossier v. Connell* and *Superwire.com, Inc.*

*v. Hampton*, A&J argues that a requirement has emerged in the common law that

---

[23] *See, e.g.*, *2009 Caiola Family Tr. v. PWA, LLC*, 2015 WL 6007596, at *14 (Del. Ch. Oct. 14, 2015) (observing that the Operating Agreement governing removal of the managing member required that "notice shall set forth the reason(s) for removal" and the managing member has "thirty days to commence an action challenging the removal"); *Feeley v. NHAOCG, LLC*, 2012 WL 966944, at *2 (Del. Ch. Mar. 20, 2012) (noting that the procedure to remove an LLC managing member under the operative agreement includes a ten-day cure period after the managing member receives notice of its default).

[24] *Rockwell v. Rockwell*, 681 A.2d 1017, 1020–21 (Del. 1986) ("This Court has held generally . . . that 'Delaware follows the well-established principal that in construing a contract a court cannot in effect rewrite it or supply omitted provisions'") (citations omitted).  In this instance, the Agreements set forth a comprehensive procedure for removal—the Class B Members vote, and if there is a Majority Vote in favor of removal, then "the Members shall be entitled to . . . appoint a new Class B Manager and to cause the Company to issue written notice of termination to the Class B Manager. . . ." Management Agreement at § 12(b); Operating Agreement at § 5.3(c)(ii).  That the bargained-for removal procedure does not contain a pre-removal notice provision, and is not, therefore, favorable to A&J, does not entitle A&J to rewrite the Agreements.  If A&J wanted greater removal protections, it should have bargained for them.

before a director of a Delaware corporation may be removed for cause, that director must be given pre-removal notice of the purported "cause" for removal and an opportunity to respond.[25]  According to A&J, there is simply no principled basis to deny a managing member of a Delaware LLC that same right and protection. For reasons explained below, I disagree.

### 1. Limited Liability Companies Are Creatures of Contract

"Delaware law with regard to limited liability companies is contractarian."[26] To this end, the Limited Liability Company Act (the "LLC Act") affords parties broad discretion in drafting LLC agreements, provides default provisions where the

---

[25] *Campbell v. Loew's, Inc.*, 134 A.2d 852, 859–60 (Del. Ch. 1957) (holding that when removing a director of a corporation for cause, "there must be the service of specific charges, adequate notice and full opportunity of meeting the accusation" because the "accused director [is] entitled to be heard in his own defense"); *Bossier v. Connell*, 1986 WL 12785, at *6 (Del. Ch. Nov. 12, 1986) (reiterating the pre-removal notice requirement articulated in *Loew's*); *Superwire.com, Inc. v. Hampton*, 805 A.2d 904, 912 (Del. Ch. 2002) ("A 'for cause' removal of a director [of a Delaware corporation] requires that the individual be given (i) specific charges for his removal, (ii) adequate notice, and (iii) a full opportunity to meet the accusation.  The same is true whether the action is taken at a meeting of stockholders or by written consent.").

[26] *Huatuco v. Satellite Healthcare*, 2013 WL 6460898, at *1 (Del. Ch. Dec. 9, 2013), *aff'd*, 93 A.3d 654 (Del. 2014).  *See also TravelCenters of Am., LLC v. Brog*, 2008 WL 1746987, at *1 (Del. Ch. Apr. 3, 2008) (observing that "limited liability companies are creatures of contract").

LLC agreements are silent and ensures that such agreements, with limited exceptions, will be honored by a reviewing court.[27]  Indeed, Section 18-1101(b) of the LLC Act expressly confirms that "[i]t is the policy of this chapter to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."[28]

"[A]n alternative entity, like the LLC at the center of this litigation, is not the same thing as a corporation."[29]  The distinction is basic; the scope, structure and very personality of the LLC is set almost exclusively by its operating agreement.[30]  "It is this flexibility that gives 'uncorporate' entities like limited liability companies their

---

[27] *See Huatuco*, 2013 WL 6460898, at *1.  *See also Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del. 1999) ("The basic approach of the Delaware [LLC] Act is to provide members with broad discretion in drafting the Agreement and to furnish default provisions when the members' agreement is silent."); *Walker v. Res. Dev. Co., L.L.C. (DE)*, 791 A.2d 799, 813 (Del. Ch. 2000) ("Once members exercise their contractual freedom in their limited liability company agreement, they can be virtually certain that the agreement will be enforced in accordance with its terms.") (internal quotations omitted).

[28] 6 *Del. C.* § 18-1101(b).

[29] *2009 Caiola Family Tr.*, 2015 WL 6007596, at *1.

[30] *R & R Capital, LLC v. Buck & Doe Run Valley Farms, LLC*, 2008 WL 3846318, at *1 (Del. Ch. Aug. 19, 2008) (citing *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *1 (Del. Ch. May 7, 2008)).

allure; a principle attraction of the LLC form of entity is the statutory freedom granted to members to shape, by contract, their own approach to common business 'relationship' problems" (like the reputational consequences of for cause removal at issue in this litigation).[31]

## 2. The Common Law Cannot Be Grafted on to the Agreements

In governance disputes among constituencies in an LLC, the starting (and end) point almost always is the parties' bargained-for operating agreement, and the court's role in these disputes is to "interpret [the] contract [and] effectuate the parties' intent."[32] In this regard, A&J is correct that, in certain contexts, this court has borrowed from corporate law principles to aid in the construction of an alternative entity operating agreement. For example, when the parties themselves embrace corporate elements within their operating agreement, this court has taken that as a signal of the parties' intent to model their alternative entity on a traditional

---

[31] *R & R Capital*, 2008 WL 3846318, at *4 (internal quotations omitted).

[32] *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *7 (Del. Ch. June 21, 2012) (internal quotations omitted).

corporate structure.[33] When the court has looked beyond the LLC agreement for guidance in construing its terms, however, the court has been careful "not to embrace analogies to other entities or legal structures too broadly or without close analysis, because the flexibility inherent in the limited liability company form complicates the task of fixing such labels or making such comparisons."[34]

Honing in on instances where this Court has borrowed from our common law of corporations to assist in its interpretation of alternative entity agreements, A&J asserts that "it is appropriate for the Court to analogize corporate law when interpreting the [] [A]greement[s]" because "the procedural protections established by *Campbell* and *Superwire.com* are common law protections . . . [that] are . . . no less applicable in the context of an LLC than a corporation."[35] Moreover, A&J

---

[33] *See, e.g.*, *Obeid v. Hogan*, 2016 WL 3356851, at \*6 (Del. Ch. June 10, 2016) ("The choices that the drafters make have consequences. . . . If the drafters have opted for a manager-managed entity, created a board of directors, and adopted other corporate features, then the parties to the agreement should expect a court to draw on analogies to corporate law."). *See also id.* at \*1 ("By opting for a corporate-style governance structure, the drafters evidenced their desire to have corporate-style legal rules govern the entity.").

[34] *Obeid*, 2016 WL 3356851, at \*6 (internal quotations omitted).

[35] Opening Br. 22.

argues the General Assembly's adoption of 6 *Del. C.* § 18-1104[36] reflects an appreciation that, in certain instances, a "purely contractarian view" must give way to the common law.[37] In my view, A&J is wrong for two reasons.

First, the precedents on which A&J relies to support the proposition that the Court should readily borrow from our corporation law when construing governance rights under a LLC operating agreement are distinguishable. It is one thing to look to the corporation law when assessing the extent to which a managing member owes common law fiduciary duties when those duties are not clearly defined in the entity's operating agreement[38]; it is another thing entirely, however, to rewrite the clearly

---

[36] Section 18-1104 states, in its entirety: "In any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern."

[37] Pl.'s Reply Br. in Supp. of Its Mot. for Summ. J. 10 (citing *In re Carlisle Etcetera LLC*, 114 A.3d 592, 605 (Del. Ch. 2015)).

[38] *See Auriga Capital Corp. v. Gatz Props., LLC*, 40 A.3d 839, 849–50 (Del. Ch. 2012), *aff'd sub nom. Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206 (Del. 2012) (analyzing whether "traditional fiduciary duties of loyalty and care apply by default as to managers or members of a limited liability company" and finding that under 6 *Del. C.* § 18-1104, there is "justification for application of fiduciary duties grounded in equity to managers of LLCs *to the extent that such duties have not been altered or eliminated under the relevant LLC agreement*") (emphasis added); *In re Cencom Cable Income P'rs, L.P. Litig.*, 2008 WL 5050624, at *4 (Del. Ch. Nov. 26, 2008) (declining to find that contractual

written procedures by which a managing member will be removed for cause and thereby impose upon the members requirements for which the parties themselves never bargained.

Second, read in A&J's light, the General Assembly intended for Section 18-1104 single-handedly to "supplant the primacy of the LLC Agreement in the alternative entity context"[39] in contravention of Section 18-1101(b)[40] and corresponding jurisprudence. That construction, in my view, reads too much into Section 18-1104. Indeed, Delaware's pro-contractarian policy in the alternative entity space is alive and well. This is perhaps best illustrated by our Supreme Court's approach to contract construction in a series of decisions concerning a limited partnership agreement. In an early iteration of *Brinckerhoff v. Enbridge Energy Co.,*

---

principles are controlling because "the General Partner imported common law fiduciary duties into its relationship") (internal quotations omitted).

[39] *Cf. Vila v. BVWebTies LLC*, 2010 WL 3866098, at \*12 (Del. Ch. Oct. 1, 2010) ("Because this restriction on direct competition is an explicit provision of § 12.02 of the LLC Agreement, [Defendant's] vague attempt to broaden the provision by pointing to traditional corporate law principles is an improper attempt to supplant the primacy of the LLC Agreement in the alternative entity context.").

[40] Section 18-1101(b) states: "It is the policy of this chapter to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."

*Inc.*, the Court looked to the common law of bad faith when construing contractual provisions that imposed a duty of good faith upon the general partner.[41] Four years later, when construing the same limited partnership agreement in a subsequent dispute among the same parties, the Court "changed course" and concluded that, in the alternative entity context, it was appropriate to measure good faith against a more traditional "contractual good faith standard of care," rather than against "common law standards of care and fiduciary duties."[42]

LAMC is a prime example of an LLC that is expressly "uncorporate"[43] in its governance structure. The Agreements provide for management by a single[44]

---

[41] *Brinckerhoff v. Enbridge Energy Co., Inc.*, 67 A.3d 369, 373 (Del. 2013) (borrowing from the common law of corporations, the court interpreted a contractual requirement that the general partner act in good faith as requiring a plaintiff to plead bad faith in order to plead a breach of that provision).

[42] *Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 247, 252–253 (Del. 2017) ("chang[ing] course" from its earlier decision and looking instead to the limited partnership agreement itself for guidance when defining good faith). *See also id.* at 259 (adopting an approach that "is more faithful to the specific language of the Enbridge LPA, and *does not rely on extra-contractual notions of waste* and a heightened pleading burden to plead bad faith") (emphasis added).

[43] *R & R Capital*, 2008 WL 3846318, at *4.

[44] I note that the Operating Agreement also provides for a "Class A Manager" who is charged with the very limited responsibilities of maintaining "the Company's compliance with [United States Citizenship and Immigration Services] rules and regulations" and

managing member rather than by a board of managers,[45] and Class B Members, unlike stockholders in a corporation, have reserved for themselves the "sole and exclusive right to approve or disapprove" several operational decisions, ranging from the incurrence of obligations, to the approval of additional capital contributions that are not made by all of the members on a pro rata basis, to the admission of additional Class B Members.[46] Under these circumstances, where the parties have not evidenced an intent to borrow from the corporate law to modify or add to the rights and obligations they bargained for in their governance agreements, I can see no basis to do so now simply because one of the parties wishes it had negotiated a better deal.

## III. CONCLUSION

By their unambiguous terms, the Agreements do not provide A&J a right to pre-removal notice or a right to be heard before removal. And, having considered

---

subscription agreements utilized by LAMC to sell Class B units to each Class B Member. Operating Agreement at 5, § 5.3(c)(i); Answer & Countercl. ¶ 11. This is yet another illustration of LAMC's "uncorporate" governance structure.

[45] Operating Agreement § 5.1.

[46] *See* Operating Agreement § 4.8(a)–(j).

that "[i]t is important not to embrace analogies to other entities or legal structures too broadly,"[47] I conclude that LAMC is clearly *not* analogous to a corporation, in structure or operation, and that drawing from corporate common law to interpret the for cause removal provisions in the Agreements would be tantamount to rewriting the Company's governance agreements without the parties' consent. "[C]onsistent with Delaware's pro-contractarian policy, a party may not come to court to enforce a contractual right that it did not obtain for itself at the negotiating table."[48]

The motion for summary judgment is DENIED.

**IT IS SO ORDERED.**

Very truly yours,

*/s/ Joseph R. Slights III*

---

[47] *Obeid*, 2016 WL 3356851, at *6.

[48] *GRT*, 2012 WL 2356489, at *7.